## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| HENRY SLEDZ, solely in his capacity as ADMINISTRATOR and FIDUCIARY of the UNITED EMPLOYEE BENEFIT FUND, | |
| Plaintiff, | |
| v. | Civil Action No. |
| L. STEVEN PLATT; ROBBINS, SALOMON, & PATT, LTD.; ROBBINS DIMONTE, LTD.; and SCOTT MAYER. | |
| Defendants. | |

## COMPLAINT

Plaintiff Henry Sledz, solely in his capacity as Administrator and Fiduciary of the United Employee Benefit Fund (the "Fund"), by and through his counsel, respectfully brings this action under the provisions of the Employee Retirement Income Security Act, Title 29 U.S.C. Sections 1001 *et seq.*, against Defendants L. Steven Platt, Robbins, Salomon, & Patt, Ltd., Robbins DiMonte, Ltd., and Scott Mayer. Plaintiff seeks damages resulting from Defendants' breaches of fiduciary duties and involvement in prohibited transactions as well as disgorgement of fees paid to Defendants and any other relief as the Court may deem appropriate.

## I.     PARTIES

1.      Plaintiff Henry Sledz ("Sledz" or "Plaintiff") is the Administrator of the Fund, a Taft Hartley Trust. The trustees delegated to Sledz, the fiduciary responsibility for evaluating claims that the Fund may have against parties. Sledz was retained by the Fund in November 2021 and has no prior knowledge of the Fund's affairs.

2.     The Fund collects hourly payments from the wages of certain union employees and uses them to provide employee benefits such as health insurance. The Fund is a qualified plan under ERISA.

3.     Pursuant to section 405 of ERISA, the Fund's Trustees, currently John Fernandez ("Fernandez") and Gary Meyers ("Meyers") (collectively, the "Trustees"), have delegated to Sledz the responsibility for determining what claims the Fund has against third parties and the responsibility for bringing these claims, as a fiduciary, against responsible parties.

4.     Defendant L. Steven Platt ("Platt") is a resident of Illinois and at all material times was an attorney licensed to practice law in Illinois. From 2015 until 2020, Platt was employed by RSP as a nonequity partner, who was an employee of the firm, and therefore, RSP is responsible for his acts and omissions. All of Platt's acts and omissions were in the scope of his employment with RSP.

5.     Defendant Robbins, Salomon, & Patt, Ltd. ("RSP") was a law firm, registered as a domestic corporation in the State of Illinois and headquartered in Chicago, Illinois. Defendant Robbins DiMonte, Ltd. ("Robbins") is a law firm, registered as a domestic corporation in the State of Illinois and headquartered in Chicago, Illinois. Defendant Robbins is the successor to Defendant RSP and thus is responsible for RSP's actions and omissions.

6.     Defendant Scott Mayer ("Mayer") is a resident of Colorado and is an attorney licensed to practice law in Illinois and Colorado.

## II.     <u>JURISDICTION AND VENUE</u>

7.     This case arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. Accordingly, this Court has exclusive subject matter jurisdiction pursuant to 29 U.S.C. § 1132(e)(1) and (f), 29 U.S.C. § 1451, and 28 U.S.C. § 1331.

The Court also has supplemental jurisdiction over state law pendent claims pursuant to 28 U.S.C. § 1367.

8.     The Northern District of Illinois is the proper venue for this action pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391 as the Fund is administered in this District, most of the Defendants reside in this District, the Defendants' alleged breaches took place in this District, and a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## III.     GENERAL CHARGING ALLEGATIONS

9.     From 2015 through 2020, Platt, through his role as an RSP partner, provided legal services to the Fund in counseling and litigation. As demonstrated below, Platt's advice fell below the standard of care required of Illinois attorneys. During the time Platt provided legal services to the Fund, he was acting under blatant conflicts of interest which were never disclosed to or waived by the Fund.

10.     During its representation of the Fund, RSP simultaneously represented Herbert O. McDowell ("McDowell"), former Trustee and service provider to the Fund, whose interests were directly adverse to those of the Fund. RSP never disclosed to the Fund that it was acting on behalf of others whose interests were adverse to the Fund nor did it ever obtain waivers.

11.     As described below, Platt also knowingly provided poor legal advice to the Fund to facilitate McDowell's violations, as Trustee, of his statutory obligations and other duties owed to the Fund. Platt acted to assist McDowell in violating the statute and knowingly participated in McDowell's ERISA violations to the detriment of Platt's client, the Fund.

12.     RSP and Platt's erroneous legal advice and breach of fiduciary duties are especially egregious as the Fund believed they were receiving advice from one of the nation's most

preeminent ERISA legal experts: Platt. To their and the Fund's detriment, the Trustees completely relied on RSP and Platt to navigate the complicated legal framework of ERISA believing that the lawyers were providing accurate advice and acting in the Fund's best interests.

**A.    Platt Is Retained After the Fund's ERISA Counsel Refused to Approve McDowell's Taking of Monies from the Fund.**

13.    In March 2015, McDowell, who controlled the Fund's management sponsor, was demanding reimbursement of $42,456.00 from the Fund for an insurance commission that the Fund paid to a Hawaiian insurance broker instead of to McDowell's company, United Preferred Companies, Ltd. ("UPC"), or to McDowell's son, Peter McDowell ("Peter"). McDowell had established his son as an insurance broker because McDowell was barred from writing insurance after a disciplinary action by the Illinois Department of Insurance. McDowell had an arrangement with his son whereby McDowell took almost all of the insurance commissions that were paid to Peter from Fund policies. When the Fund refused to pay the commission in question to Peter and his company, PRM Financial Group, Inc. ("PRM"), McDowell demanded that the Fund pay Peter (and thus, McDowell) the amount of the lost commission.

14.    Based upon advice from the Fund's prior counsel that the proposed transaction (paying McDowell's son) was a prohibited transaction that constituted a statutory violation of ERISA, David Fensler ("Fensler") and Fernandez, then the Fund's Trustees, rejected McDowell's demand on the grounds that McDowell's company had no valid agreement for the payment of commission to Peter, and that the Hawaiian broker had facilitated the transaction and thus earned the commission.

15.    In late April 2015, McDowell, who controlled the Fund's management sponsor, inappropriately used his influence to remove Fensler, then the Employer Trustee, and install himself as the Employer Trustee. Fensler remained with the Fund as the Fund's Administrator at

the time. Once he assumed his position as a Trustee, McDowell then convinced the Fund to fire the prior Fund counsel who had opposed his request for the Hawaiian commission.

16.     McDowell asked his counsel to find a Fund attorney with whom he could work, meaning someone who would accede to McDowell's inappropriate requests. His lawyer knew Platt and recommended him as the new Fund attorney.

17.     Platt met with McDowell. After his meeting with McDowell, Platt sent McDowell's attorney an email that summarized his meeting with McDowell. Platt stated that McDowell explained that McDowell was upset with prior Fund counsel who had disapproved the transaction, complaining that prior counsel was "unwilling to find solutions to problems" instead of just saying no. Platt wrote that he believed that "lawyers are supposed to be problem solvers, not problem creators." Platt promised McDowell's lawyer that he would treat McDowell "with kid gloves." Based on McDowell's recommendation after his meeting with Platt, the Fund retained Platt as Fund counsel. Platt therefore obtained the Fund's legal business by promising to favor McDowell over the Fund's interests, a promise which Platt kept.

18.     Platt promptly recommended that the Fund settle a fictitious dispute which had been made up over the Hawaiian insurance commissions by paying $42,000.00 to McDowell's son's entity, PRM. Platt flatly stated that it was in the best interests of the Fund to do so.

19.     When the Fund's Administrator challenged the payment to PRM, stating that the Trustees had disapproved it a month before, Platt recommend that the Administrator be fired for insubordination.

20.     The Fund wrote a check for $42,000.00 to PRM, signed by McDowell. PRM then turned over the payment to McDowell. Neither Peter nor his entity PRM ever actually asserted a claim for the disputed commissions or threatened suit. Only McDowell threatened legal action, but

he had no legal basis to assert that he or his company, UPC, were owed commissions. The threat was a pretext.

21.     Platt later misrepresented the transaction to the Fund auditors, who had questioned whether the transaction constituted a prohibited transaction. He reiterated to the auditors what McDowell had told him, that PRM had reached out to the Fund for their commissions, when neither Peter nor PRM had done so. Platt never bothered to investigate nor conduct any due diligence of the matter as was required in his duty to the Fund, instead protecting only McDowell's interest.

**B.     RSP Wrongfully Advised the Fund to Loan Monies to McDowell Who Was a Fund Trustee.**

22.     In August 2015, McDowell, who was a Trustee, desired to borrow $5,000.00 from the Fund. ERISA prohibits loans between trustees and ERISA plans.

23.     McDowell requested Platt to advise the Fund whether he could borrow monies from the Fund.

24.     Platt promptly stated that loans were permissible under the statute. There was no basis for this advice. Sections 406 and 408 of ERISA flatly prohibit loans to trustees.

25.     Based upon Platt's advice, McDowell instructed the Fund's Administrator to prepare a check made payable to McDowell, which McDowell signed.

26.     Platt then lied about the transaction to the Fund's auditors after they determined that the transaction was prohibited and must be reported on the Fund's financial statements. Attempting to avoid the party in interest issues raised by the auditors, Platt flatly represented to Fund auditors that McDowell was a participant in the Fund through a retirement account which he used to borrow money under the hardship exemption and had repaid the loan. In fact, the loan was never repaid.

27.    Platt also attempted, at times, to represent to the auditors that McDowell had repaid the loan. In one such attempt to provide "evidence" of the loan's repayment to the auditors, Platt orchestrated the transfer of Fund monies from RSP's Trust Account to the Fund's bank account.

28.    On January 25, 2017, Platt emailed McDowell that the auditor was raising "party in interest issues." In order to placate the auditor, Platt told McDowell that he wanted McDowell to "authorize a payment of $5,500.00 to the trust to Teri and then tell David it is the repayment by wire of the money you borrowed." Platt was referring to Terry DeMunster ("DeMunster") (an RSP employee responsible for coordinating transfers out of the Trust Account) and David Fensler (then the Fund's Administrator).

29.    A little over a week later, on February 2, 2017, Platt himself put the plan in motion, emailing DeMunster "We need $5,500.00 transferred to the UEBF fund by wire . . . from the McDowell account – Herb will call you this afternoon to verify." Of course, the "McDowell account" referred to the Fund's Trust Account at RSP. The following day, RSP transferred $5,500.00 out of the Trust Account back to the Fund.

30.    Platt, without the knowledge or approval of the Fund and its Trustees, orchestrated a plan whereby McDowell was allowed to use Fund assets to falsely claim he repaid an improper party-in-interest loan. This was a clear breach of his responsibilities and duties as Fund counsel and as an ERISA fiduciary.

**C.    RSP Issued an Erroneous Opinion that the Fund Could Hire McDowell.**

31.    While McDowell was serving as Trustee, Platt advised the Fund—which at that time only had one independent Trustee, Fernandez—that it could retain McDowell to serve as a Fund service provider and pay him an annual salary of $300,000.00, plus a $25,000.00 signing

bonus. That advice directly contradicted ERISA, which prohibits paying excessive compensation to a party in interest.

32.     In November 2015, based on RSP's advice, the Fund hired McDowell as a service provider at the rate of $25,000.00 per month with a $25,000.00 signing bonus. Platt expressly advocated for the compensation, arguing that it was reasonable.

33.     There was no justification for providing McDowell with a signing bonus—a bonus McDowell received the same day as the Trustee meeting by signing a check to himself on behalf of the Fund. He was not a service provider who was in high demand and was not indispensable to the Fund.

34.     Further, the compensation of $25,000.00 per month was also indefensible. McDowell provided no meaningful services.  Later, McDowell's contractual compensation was increased, at Platt's recommendation, to $37,500.00 per month. Platt falsely stated that the increase was required because McDowell's services were innately valuable and the contractual increase comported with compensation paid to similarly situated fiduciaries and thus, was reasonable.

35.     When the Trustees expressed reservations about compensating McDowell at the levels that he sought, Platt, nearly a year after McDowell's compensation began, stated that he would provide an expert opinion justifying McDowell's compensation. In November 2016, Platt contacted an acquaintance—Defendant Mayer, an attorney licensed in Colorado and Illinois—and requested that he sign a legal opinion justifying McDowell's contract and compensation.

36.     Mayer possessed little to no expertise in ERISA. Prior to opening his own firm in Colorado, Mayer worked as an attorney for the United States Postal Service for nearly twelve years. There, his practice primarily focused on labor employment litigation defense involving labor appeals and worker compensation matters.

37.     Mayer's opinion letter was not the byproduct of a vigorous, independent investigation as he spent barely any time on the letter. On November 16, 2016, Platt emailed an already prepared draft of a separate opinion letter on the Fund's proposed purchase of McDowell's Wilmette home (discussed below) to Mayer telling him "this is one of the two letters I want you to send." Approximately one minute later, Platt sent a draft of the McDowell compensation opinion letter to Mayer, writing "Here is the other one." Mayer reviewed the draft, made only negligible edits, placed it on his letterhead, signed it, and then sent it back to Platt. Mayer adopted Platt's conclusions wholesale, having conducted no independent research of his own, and passed it off to the Fund as his own legal, independent opinion.

38.     Platt never disclosed to the Trustees that he had prepared Mayer's opinion letter or that Mayer was not an ERISA expert. Mayer breached his duties, inter alia, by falsely stating that the opinion was an independent opinion, when in fact that it was authored by Platt, that it was accurate and that it was based on a compensation survey. The opinion also blatantly misstated ERISA principles, including the prohibited transaction statutes and basic fiduciary principles of undivided loyalty and competence by trustees.

**D.      Platt Advised the Fund that It Could Lawfully Purchase a Home for McDowell's Benefit.**

39.     McDowell owned a home located at 1134 Greenwood Avenue, Wilmette, Illinois. By 2016, McDowell had fallen behind on his mortgage payments, and the lender had instituted foreclosure proceedings.

40.     RSP and Platt decided that the Fund should commit resources to redeem McDowell's foreclosed house. Platt characterized his efforts as the "Herb rescue mission."

41.     First, Platt prepared a letter on RSP letterhead to Heartland Bank, the lender foreclosing on McDowell's home, advising the bank that the Fund Trustees "approved a

$500,000.00 loan to Herb McDowell for real estate with a $100,000.00 down payment" available on the date of the letter, August 23, 2016. Platt had both Trustees sign the letter.

42. When one of the trustees, Gary Meyers, raised questions, Platt advised that the loan "has to be a bad deal for him and a better than market deal for the fund . . . . ERISA would not have it any other way." However, Platt's advice was demonstrably wrong as the loan was not a "bad deal" for McDowell; it was a good deal for McDowell and a terrible deal for the Fund. The Fund did not have a loan agreement in place with McDowell. The Fund has not earned any interest on this purported "loan" to McDowell. Nor has McDowell paid this loan back. Nothing about this transaction complied with ERISA.

43. Platt advised the Fund's Trustees and employees to transfer $100,000.00 to McDowell's foreclosure attorney because the loan posed "no problems." The Fund wired the $100,000.00 to McDowell's foreclosure attorney on August 23, 2016, the same days as the letter.

44. The $100,000.00 did not allow McDowell to stave off foreclosure and Heartland Bank subsequently foreclosed on McDowell's home.

45. Following the foreclosure on the home by Heartland Bank, RSP and Platt advised the Fund that it could purchase the home by using a strawman to acquire the property. Platt erroneously represented to the Trustees that the transaction was in the best interest of the Fund and complied with the statute.

46. RSP transferred $1,125,000.00 in Fund assets out of the RSP Trust Account to David Schwalb ("Schwalb") for the purpose of having Schwalb purchase McDowell's house from Heartland Bank. Schwalb was a real estate attorney and broker who agreed to facilitate the transaction.

47.     Platt negotiated the terms of the loan with Schwalb and misrepresented its terms to the Trustees. Platt represented to the Trustees the that the loan would bear 6% interest; in fact, at closing, with Platt's consent, the loan was at 3% interest. Platt also represented that the loan would be secured; it was unsecured. Finally, the loan was made to a single purpose entity and was not guaranteed by Schwalb and thus involved substantial risk of non-payment.

48.     Platt then solicited another opinion from Mayer, which he represented to the Trustees was an independent expert opinion. In fact, Platt wrote the opinion. The opinion misstated the transaction, falsely stating, for example, that the loan was at 6% interest.

49.     Platt used the Mayer opinion to persuade the Trustees that the transaction was compliant with ERISA.  As stated above, Mayer breached his duties in issuing the opinion, which was not an independent opinion, contained inaccurate and willfully false statements and misstated basic ERISA principles.

50.     Following Schwalb's purchase of the home, Schwalb allowed McDowell to move back into the property for a monthly rent payment of $8,500.00.

51.     At Platt's request, the Fund's Administrator arranged to pay the $8,500.00 monthly rental payments directly to Schwalb. Platt advised the Trustees that the Fund should advance the rental payments because that was purportedly in the Fund's interest. This house loan and rental arrangement violated ERISA and constituted a prohibited transaction.

**E.  Platt Advised the Fund to Deposit Fund Assets into the RSP Trust Account over Which RSP Practically Gave McDowell Control.**

52.      McDowell obtained several million dollars from Fund-owned life insurance policies. Platt and McDowell decided that McDowell would deposit the funds into RSP's Trust Account instead of the Fund's accounts. The purpose was to conceal the funds' disposition from the Trustees and to provide McDowell with control over the funds. Platt represented that the

deposit into RSP's Trust Account complied with ERISA because the statute permitted funds to be held in any account designated as a trust account. In fact, ERISA section 403 requires ERISA assets to be held in a plan trust account designated in the plan documents, and RSP's Trust Account failed to meet this standard.

53.     Without notifying the Trustees, Platt gave McDowell control over RSP's Trust Account. McDowell was permitted to issue instructions to RSP's clerical staff regarding disbursements from the Trust Account. The Trustees never authorized nor delegated such control over Fund assets to McDowell.

54.     With the assistance of Platt, McDowell misappropriated funds from the RSP Trust Account, which were not used for the Fund or Fund-approved purposes. RSP and Platt approved these transfers.

55.     On January 13, 2017, McDowell emailed Platt requesting the transfer of $50,000.00 from the RSP Trust Account. Platt, recognizing the impropriety of acquiescing to McDowell's request, initially resisted the request, telling McDowell "[W]e should NOT be taking this out of the trust – the trust money should not be touched and should NOT be used to settle with the bank – repeat NOT BE TOUCHED." Yet, that same day Platt and RSP transferred $50,000.00 out of the Trust Account to McDowell's foreclosure attorney, which was for funding McDowell's attorney and not for Trust purposes. The Fund and its Trustees did not approve this transfer, nor did they have any knowledge of the disbursement of these monies. The transfer provided no benefit to the Fund.

56.     Just ten days later, on January 23, 2017, Platt exchanged numerous emails with McDowell's foreclosure attorney regarding funds needed to finalize a settlement resolving a deficiency judgment with Heartland Bank—the bank that foreclosed on McDowell's Wilmette

home. McDowell's foreclosure attorney wrote to Platt, "I am close to resolving this matter completely. My worst case scenario is $250,000.00." In response, Platt enthusiastically wrote "hope for the best, plan for the worst – we have enough if you need it." After McDowell's foreclosure attorney thanked him, Platt replied "Only the best for the best!!"

57.     Two days later, on January 25, 2017, RSP and Platt authorized the transfer of $250,000.00 from the RSP Trust Account to McDowell's foreclosure attorney to settle McDowell's deficiency judgment with the Bank. The Fund and its Trustees did not approve this transfer, nor did they have any knowledge of the disbursement of these monies. The transfer provided no benefit to the Fund.

58.     Several months later, McDowell was again allowed to withdraw large sums of money from the RSP Trust Account for his own purposes.  These amounts were paid for McDowell's sole benefit and constituted self-dealing.

59.     In August 2017, RSP and Platt allowed McDowell to withdraw $52,000.00 from the RSP Trust Account in a check payable to McDowell. The Fund and its Trustees did not approve this transfer, nor did they have any knowledge of the disbursement of these monies. The transfer provided no benefit to the Fund.

60.     Two months later, in October 2017, RSP and Platt again allowed McDowell to make a substantial withdrawal from the RSP Trust Account, this time allowing McDowell to receive $32,000.00 in a check payable to McDowell. The Fund and its Trustees did not approve this transfer, nor did they have any knowledge of the disbursement of these monies. The transfer provided no benefit to the Fund.

61.     Meanwhile, as RSP and Platt facilitated these large transfers, they consistently authorized monthly payments of $3,500.00 to McDowell for purported "health plan" research

(discussed below). From April 2017, to March 2018, RSP and Platt authorized the transfer of payment for these "services" out of the RSP Trust Account.

62.     All of the aforementioned transactions constituted prohibited transactions and provided no benefit to the Fund.

**F.      Based Upon Platt's Recommendation, the Fund Paid McDowell Unreasonable Compensation for Health Product Research.**

63.     In order to benefit McDowell, Platt advised the Fund to pay an additional monthly fee to McDowell on top of his already inflated monthly compensation.

64.     Once the RSP Trust Account was closed in or around the spring of 2018, McDowell still insisted on receiving his supplemental payments for "health plan research." Pursuant to Platt's advice, the Fund began making the monthly $3,500.00 payments to McDowell out of its own coffers.

65.     McDowell performed no meaningful services for said payments. When the Trustees questioned the payments, Platt instructed them to continue the payments assuring them that it was compliant with ERISA and that the Fund required McDowell's fictitious services.

66.     Platt and RSP performed no research regarding whether there were alternative service providers who were more capable and cost effective.

67.     Platt later conceded that RSP and he had advised the Fund to make the payments and informed the Trustees that his advice was indefensible.

**G.     RSP and Platt Advised a Fund Party in Interest to Borrow Money in a Prohibited Transaction to Pay RSP's Fees.**

68.     RSP and Platt represented Gilman OpCo. Ltd, which was partially owned by Schwalb and Meyers, in connection with real estate litigation unrelated to the Fund.

69.     A dispute arose over RSP's and Platt's services as well as the reasonableness of their billings.

70.     Platt advised Schwalb that Schwalb should borrow monies from the Fund to pay the disputed invoice. Platt stated that he would arrange approval of the loan and advise the Trustees that it was compliant with ERISA because the loan was for "real estate investments."

71.     Based upon RSP's and Platt's advice, the loan was made to Schwalb who arranged to pay RSP its disputed invoice. Platt misrepresented the transaction to Fernandez, a Trustee who voted to approve the loan.

72.     The loan constituted a prohibited transaction and a breach of RSP and Platt's duties to the Fund.

## H. RSP and Platt Advised the Fund's Administrator to Breach His Fiduciary Duties in Using Fund Assets to Pay a Personal Judgment.

73.      The Fund's Administrator, Fensler, previously a Trustee, operated a separate business called AdminiTrust, Inc. ("AdminiTrust"), which provided services to single employer retiree health plans. This business was not related to the Fund's business.

74.     McDowell and his former partner established the AdminiTrust business, feeding Fensler single employer plans for him to service. McDowell also acted as a service provider to AdminiTrust.

75.     From 2012 to 2015, Fensler converted more than $100,000.00 from the Susan A. Designs Employee Benefit Trust ("Susan Designs"), an AdminiTrust client. On information and belief, Fensler provided these converted funds to McDowell or entities controlled by him.

76.     Susan Designs learned of the conversion and filed suit in 2018 against Fensler and AdminiTrust in Cook County, Illinois to recover the lost funds. RSP and Platt represented the defendants.

77.     Without Fund authorization, RSP billed its services for AdminiTrust and Fensler's representation to the Fund in the Fund's general invoice and never advised the Fund's Trustees of the litigation.

78.     For example, on April 6, 2018, RSP allowed $5,000.00 from the Trust Account to be applied as a retainer to engage RSP and Platt's legal services for the Susan Designs matter. The services did not benefit the Fund.

79.     Designs obtained a summary judgment against Fensler. RSP and Platt subsequently negotiated the judgment to $180,000.00, payable in six installments.

80.     After Fensler complained that he could not pay the judgment and McDowell stated that he could not reimburse Fensler, Platt suggested that Fensler, as the Fund's Administrator, advance McDowell his compensation from the Fund accounts which McDowell would use to pay the judgment. The Fund was not aware of nor did it authorize these advancements.

81.     During the second half of 2019, Fensler, acting on RSP and Platt's advice, made monthly advancements to McDowell, which he used to pay the judgment. Additionally, RSP and Platt served as key conduits for these settlement payments as they received the checks from McDowell and his entity, UPC, before forwarding them along to Susan Designs' counsel.

82.     RSP and Platt knew of Fensler's and McDowell's breaches of duty but concealed them from the Fund.

83.     Defendants fraudulently concealed their actions and engaged in fraud, which were not revealed until plaintiff commenced an investigation.  Thus, the statute of limitations for all ERISA claims should be tolled under ERISA §413, 29 U.S.C.§1113 because defendants engaged in fraud or concealment of their actions.

84.     Defendants also adversely dominated and controlled the Fund until recently and therefore controlled the Fund's ability to seek redress for the wrongful actions taken against it which are the subject of this complaint. Therefore, the statute of limitations should be tolled until the date that defendants' control ended.

## COUNT I
### (ERISA Breach of Fiduciary Duty Against Platt, RSP and Robbins)

85.      Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

86.     This claim is for fiduciary breach of the Employee Security Act of 1974.

87.     Platt and RSP were either ERISA fiduciaries because they controlled plan assets and exercised control over the plan or were non fiduciaries who substantially assisted plan fiduciaries in their breach of fiduciary duty and participated in the fiduciary breaches.

88.     As a direct and proximate result of Platt's and RSP's actions, the Fund sustained losses which defendants must restore to the Fund from their assets. Such losses include but are not limited to:

a.     $400,000.00 paid to McDowell to assist him with his home foreclosure as stated in paragraphs 43, 55 and 57;

b.     $1,500,000.00 in excessive compensation paid to McDowell pursuant to the contractual arrangements stated in paragraphs 32, 34 and 64;

c.     $200,000.00 in lost interest on the loan made to Schwalb when Platt negotiated without authority at closing the loan interest to 3% instead 6% as stated in paragraph 47;

d.     $84,000.00 in additional transfers, not including the health research payments, directly to McDowell from the RSP Trust Account as stated in paragraphs 59 and 60;

     e.      $180,000.00 paid towards the Susan Designs' judgment as stated in paragraphs 73 through 82;

     f.      $42,566.00 paid to PRM which was taken by McDowell as stated in paragraphs 13 through 71;

     g.      $5,000.00 loan made to McDowell as stated in paragraphs 22 through 28;

     h.      At least $500,000.00 in statutory penalties and lost opportunity costs being assessed by the U.S. Department of Labor in the investigation growing out of defendants' violations; and

     i.      At least $513,000.00 in attorneys' fees paid by the Fund to RSP, which must be disgorged as a result of the breach of fiduciary duty.

89.     Defendants should be required to restore to the Fund the aforementioned amounts together with interest and cost, plus plaintiff's reasonable attorneys' fees and costs.

## COUNT II
### (Professional Negligence Against Platt and RSP)

90.     Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

91.     This claim is for professional negligence.

92.     The Fund retained Platt and RSP for legal services. Platt was obligated to provide such services with the requisite level of skill and in conformance with legal and ethical standards prescribed by applicable law.

93.     For the reasons stated above, Platt and RSP breached their duties by providing advice that fell below the standard of care and violated legal service and acting under disabling conflict of interest.

94.     As a direct and proximate result of defendants' conduct, plaintiffs are owed at least $3,000,000.00 and interest and costs.

## COUNT III
### (ERISA Breach of Fiduciary Duty Against Mayer)

95.     Plaintiff repeats and realleges all allegations contained in the foregoing paragraphs as if fully set forth herein.

96.     This claim is for fiduciary breach of the Employee Security Act of 1974.

97.     Mayer was a non-fiduciary who substantially assisted plan fiduciaries in their breach of fiduciary duty and participated in the fiduciary breaches.

98.     Mayer substantially assisted and participated by signing the two opinion letters referenced in paragraphs 31 and 44 above, which were prepared by Platt. These two opinion letters were used to justify the misappropriation of Fund assets.

99.     Moreover, because Mayer concealed the true nature of many of his actions, his conduct suspended the statute of limitations under 29 U.S.C. § 1113.

100.    As a direct and proximate result of defendant's actions, the Fund sustained losses which defendant must restore to the Fund from his assets. Such losses include but are not limited to:

a.      $400,000.00 paid to McDowell to assist him with his home foreclosure;

b.      $1,500,000.00 in excessive compensation paid to McDowell;

c.      $200,000.00 in lost interest on the loan made to Schwalb;

d.      At least $500,000.00 in statutory penalties and lost opportunity costs being assessed by the U.S. Department of Labor in the investigation growing out of defendant's violations; and

e.      At least $50,000.00 in attorney's fees paid by the Fund to Mayer.

101.    Defendant needs to restore to the Fund the amounts listed in the aforementioned amounts together with interest and cost, plus plaintiff's reasonable attorneys' fees and costs.

## COUNT IV
### (Professional Negligence Against Mayer)

102.     Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

103.     This claim is for professional negligence.

104.     The Fund retained Mayer for legal services. Mayer was obligated to provide independent legal opinions on the house purchase transaction and McDowell's contract for services. The Fund's Trustees relied upon these opinions. Mayer was obligated to provide such services with the requisite level of skill and in conformance with legal and ethical standards prescribed by applicable law.

105.     For the reasons stated above, Mayer breached his duties by providing advice that fell below the standard of care and violated legal services and acting under disabling conflict of interest.

106.     As a direct and proximate result of defendant's conduct, plaintiffs are owed at least $2,000,000.00 and interest and costs.

## COUNT V
### (Declaratory Relief for Indemnity and Contribution Against the Defendants)

107.     Plaintiff repeats and realleges each of the allegations in the foregoing paragraphs as if fully set forth herein.

108.     This claim is for declaratory relief for contribution.

109.     The U.S. Department of Labor ("Department") has initiated an investigation of the matters set forth above. On May 10, 2021, the Department issued a ten-day letter asserting that its investigation found evidence of ERISA violations and it would sue unless the Trustees reimbursed the Fund over $3.5 million.

110.     A dispute has arisen between the Fund and the Defendants over the investigation. Plaintiff asserts that the investigation and its allegations of ERISA violations are the result of the Defendants' actions and the Defendants should reimburse Plaintiff for its defense costs and the amounts claimed by the Department. Defendants have denied liability.

111.     This Court should enter judgment declaring that Defendants should reimburse Plaintiff its cost of defense and any liability or settlement with the Department, including penalties, lost opportunity costs, and interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

1.       On Count I, an order requiring Defendants to restore, in accordance with proof, the amount the Fund lost through Defendants' fiduciary breaches;

2.       On Count I, an order requiring Defendants to restore, in accordance with proof, the amount the Fund lost through third parties fiduciary breaches in which Defendants participated;

3.       On Count II, monetary judgment in accordance with proof;

4.       On Count III, an order requiring the Defendant to restore, in accordance with proof, the amount the Fund lost through Defendant's fiduciary breaches;

5.       On Count III, an order requiring the Defendant to restore, in accordance with proof, the amount the Fund lost through third parties fiduciary breaches in which Defendant participated;

6.       On Count IV, monetary judgment in accordance with proof;

7.       On Count V, an order declaring that the Defendants have to indemnify and contribute to any amounts recovered by the U.S. Department of Labor and pay any investigative costs incurred by the Fund;

8.       For an order disgorging all fees paid to the Defendants;

9.      For prejudgment interest and costs;

10.    For an award of reasonable attorneys' fees and costs on Counts I and III; and

11.    For such further and other relief that this Court deems appropriate and necessary.


DATED: February 22, 2022        HENRY SLEDZ, solely in his capacity as
                                      ADMINISTRATOR and FIDUCIARY of the
                                      UNITED EMPLOYEE BENEFIT FUND


                                      By: <u>/s/ Robert R. Tepper</u>
                                        Robert R. Tepper
                                        Dressler | Peters LLC
                                        70 W. Hubbard St, Suite 200
                                        Chicago, IL 60654
                                        Direct: 312-251-0031
                                        Office: 312-602-7360
                                        Email: rtepper@dresslerpeters.com
                                        ARDC: 2810190